NO









NO. 12-08-00175-CV

 

                         IN
THE COURT OF APPEALS             

        

            TWELFTH
COURT OF APPEALS DISTRICT

 

                                      TYLER, TEXAS

WENDELL REEDER,

APPELLANT                                                     '     APPEAL
FROM THE 402ND

 

 

V.                                                                         '     JUDICIAL
DISTRICT COURT OF

 

WOOD COUNTY ENERGY L.L.C.,

WOOD COUNTY OIL & GAS,
LTD.,

NELSON OPERATING, INC.,
DEKRFOUR,

INC., BOBBY NOBLE, EXZENA
OIL            '     WOOD
COUNTY, TEXAS

CORPORATION, DAVID FRY and

PATRICIA FRY,

APPELLEES

 





OPINION
ON REHEARING

            Wendell
Reeder has filed a motion for rehearing, which is overruled.  We withdraw our
opinion of April 28, 2010 and substitute the following opinion in its place.

            This
is a breach of contract case arising out of competing claims to certain
interests in an old oil field.  Following a jury trial, the trial court rendered
a judgment against Wendell Reeder.  The judgment awarded Patricia Fry $7,500.00
plus prejudgment interest.  The judgment also awarded Dekrfour, Inc., Nelson
Operating, Inc., Bobby Noble, and Wood County Oil and Gas, Ltd. $872,493.25
plus prejudgment interest, along with $125,000.00 in attorney’s fees plus
prejudgment interest.  Reeder raises seventeen issues challenging the trial
court’s conclusion that he is bound by a 1996 joint operating agreement, the
jury’s findings that he breached the joint operating agreement, and the jury’s
award of damages, attorney’s fees, and prejudgment interest.  We modify the
damage awards and prejudgment interest awards in part, suggest a partial
remittitur of attorney’s fees, and affirm the judgment as modified.

 

 

 

Background

            The
Forest Hill Field Sub-Clarksville Unit was created in 1965, and the Forest Hill
Field Harris Sand Unit was created in 1975.  The two units overlapped, and oil
was being produced from both.  In 1995, Dekr, Inc. purchased the working
interest in the Forest Hill Field and transferred it to Dekrfour, Inc.
(“Dekrfour”).  David Fry owned both companies.

In
1996, Dekrfour and Secondary Oil Corporation, Inc. entered into a mutual
agreement regarding Dekrfour’s sale of an 85% working interest to Secondary. 
The interest was limited to the Harris Sand formation, and to specific wells
within the Harris Sand Unit.  Dekrfour retained a 15% carried working
interest.  The mutual agreement became part of a joint operating agreement
(“JOA”) that Dekrfour and Secondary executed eleven days later. Pursuant to the
JOA, Dekrfour, Secondary, and Secondary’s sister corporation would share the
existing wellbores in the production of the Sub-Clarksville and Harris Sand Units.[1] 
Dekrfour transferred the 85% working interest to Secondary as agreed, and also
transferred a 10% carried working interest in the same formation and wells to Nelson
Operating, Inc., another of David Fry’s companies.  In the same document,
Dekrfour transferred its interest in all other formations in these wells to
Nelson.    

            In
1998, Reeder became operator of the Harris Sand Unit when he and Don Dacus
purchased 87.5% of the working interest in the unit wells previously
transferred to Secondary.  Dekrfour and Nelson collectively owned a 12.5%
carried working interest in the Harris Sand Unit.  Reeder acquired Dacus’s share
of the working interest after Dacus died.  In May 2004, Reeder formed a limited
partnership, Wood County Oil and Gas, Ltd. (“Wood County Oil”) in which Reeder
and James Wade each owned 45% and Hattie Scherbach owned 10%.  Reeder, who had
no prior experience in oilfield operations, continued to maintain from 1998
forward that he was the operator of the Harris Sand Unit.

            From
1998 forward, Reeder’s relationship with David Fry and his companies gradually developed
into an adversarial one.  In April 2003, Bobby Noble purchased a portion of
Dekrfour’s and Nelson’s Sub–Clarksville interest.  Beginning in 2003, however, Reeder
refused to allow Dekrfour, Nelson, and Noble (collectively, the “Fry
Interests”) to use any of the wellbores he controlled to produce from the
Sub–Clarksville Unit.[2] Consequently,
from 2003 forward, the Fry Interests were unable to develop new production out
of the Sub-Clarksville Unit.   By the summer of 2006, the Texas Railroad
Commission had sealed wells and severed the pipeline from the Harris Sand
Unit.  In an August 8, 2006 letter to Wade and Scherbach, Reeder stated that he
was “prepared to engage necessary services from appropriate geologists and
others to accomplish the repairs to get the pumping wells unsealed and the
severance released.”  But he did nothing.  By September 2006, all production
had ceased in the Harris Sand Unit.  Because oil was not produced from the
Harris Sand Unit in paying quantities, the unit expired, and the leases not
held by production from other zones were lost.

 

Litigation Regarding Interests

            In
May 2004, Reeder filed a suit against the Fry Interests asserting that he was
the operator of certain wells in the Harris Sand Unit and that he had the
exclusive right to possession of the wellbores for the purpose of producing oil
from them.  David and Patricia Fry were also named as defendants.  Later, Wood
County Oil and Gas, Ltd. and its general partner, Wood County Energy, L.L.C.
(collectively “Wood County”) joined Reeder’s suit as plaintiffs seeking damages
in connection with those wells.  Reeder and Wood County contended that they had
the exclusive right to produce from the Harris Sand Unit, they retained the
right to the wellbores to the exclusion of the Fry Interests, and that the Fry Interests
had interfered with those rights.  Reeder and Wood County further alleged that the
Fry Interests had unlawfully converted production from the Harris Sand Unit;
committed trespass, conversion, and theft; and wrongfully dispossessed Reeder
and Wood County of their property, causing damage to the existing wells in the
process.  Reeder and Wood County sought damages and a declaratory judgment that
the Fry Interests had no right to interfere with the wellbores or with Reeder’s
rights as operator.  They also sought an injunction to keep the Fry Interests from
interfering with their right to possession of the wells in question.

            The
Fry Interests filed a cross-action against Reeder and Wood County relating to
the same wells. They alleged that Reeder, as successor in interest under the
assignment of the JOA, had breached the JOA.  Additionally, the Fry Interests
alleged that Reeder failed to produce the unit in paying quantities and that
Reeder had converted their personal property.  In addition to damages, they
sought a declaratory judgment specifying their rights to develop the
Sub-Clarksville Unit, rescinding the JOA, and determining the title issues involving
Wood County.  Patricia Fry alleged that she had previously operated some of the
wells and had been fined by the Texas Railroad Commission because Reeder had
failed to file a document required by the Commission.

            Later,
Wood County switched sides and asserted that if the Fry Interests suffered any
damages, those damages were caused by Reeder in his capacity as operator of the
Harris Sand Unit.  Wood County then filed a cross-claim against Reeder for all
damages that it might have suffered as a result of his actions as operator. 
Further, Wood County sued Reeder for any damages suffered as a result of any
lost leases and loss of the unit.  Wood County nonsuited its claims against the
Fry Interests, although it continued to seek a declaratory judgment regarding
its ownership interest. 

            After
a trial before a jury, the trial court signed its final judgment ordering that
Reeder take nothing and declaring that Reeder owns no mineral interest in the
leases covering the former Harris Sand Unit or the former Sub–Clarksville Unit. 
The trial court ordered Reeder to pay Patricia Fry $7,500.00 plus prejudgment
interest for his failure to file the document with the Railroad Commission.  The
trial court further ordered that the Fry Interests and Wood County Oil recover actual
damages from Reeder totaling $872,493.25, plus prejudgment interest.  Reeder
was also ordered to pay $125,000.00 in attorney’s fees, plus prejudgment interest. 
Reeder timely appealed the damage awards against him.  

 

Sufficiency of the Evidence

            In
his first ten issues, Reeder maintains that the evidence is insufficient to
support the jury’s findings that he breached the JOA by failing to maintain
production and by failing to offer Well No. 116 back to the nonoperators before
he plugged it.

Standard
of Review -- Legal Sufficiency

            When
the appellant is challenging the legal sufficiency of the evidence to support a
finding on which he did not have the burden of proof at trial, the appellant
must demonstrate on appeal that no evidence exists to support the adverse
finding.  Croucher v. Croucher, 660 S.W.2d 55, 58 (Tex. 1983). 
In reviewing for legal sufficiency of the evidence, we consider the evidence in
the light most favorable to the verdict.  See AutoZone, Inc. v. Reyes,
272 S.W.3d 588, 592 (Tex. 2008).  The test for legal sufficiency “must always
be whether the evidence at trial would enable [a] reasonable and fair-minded
[fact finder] to reach the [result] under review.”  City of Keller v.
Wilson, 168 S.W.3d 802, 827 (Tex. 2005).  Legal sufficiency review must
credit favorable evidence if a reasonable fact finder could, and disregard
contrary evidence unless a reasonable fact finder could not.  Id. 


We
sustain a legal sufficiency challenge when the record discloses one of the
following situations: (1) there is a complete absence of evidence establishing
a vital fact, (2) the court is barred by rules of law or of evidence from
giving weight to the only evidence offered to prove a vital fact, (3) the
evidence offered to prove a vital fact is no more than a mere scintilla, or (4)
the evidence conclusively establishes the opposite of a vital fact.  Uniroyal
Goodrich Tire Co. v. Martinez, 977 S.W.2d 328, 334 (Tex. 1998).  Anything
more than a scintilla of evidence is legally sufficient to support the finding.
 See  Cont’l Coffee Prods. Co. v. Cazarez,
937 S.W.2d 444, 450 (Tex. 1996); Leitch v. Hornsby, 935 S.W.2d
114, 118 (Tex. 1996).  More than a scintilla of evidence exists if the evidence
furnishes some reasonable basis for differing conclusions by reasonable minds
about the existence of a vital fact.  Rocor Int’l, Inc. v. Nat’l Union
Fire Ins. Co., 77 S.W.3d 253, 262 (Tex. 2002).

            The
fact finder is the sole judge of the credibility of the witnesses and the
weight to be assigned to their testimony.  City of Keller, 168
S.W.3d at 819.  Reviewing courts must assume that the fact finder decided all
credibility questions in favor of the verdict, crediting testimony favorable to
the verdict and disbelieving testimony contrary to it if a reasonable person
could do so.  Id.   

Standard
of Review -- Factual Sufficiency

            If a
party is attacking the factual sufficiency of the evidence to support an
adverse finding on an issue to which the other party had the burden of proof,
the attacking party must demonstrate that there is insufficient evidence to
support the adverse finding.  Westech Eng’g, Inc. v. Clearwater
Constructors, Inc., 835 S.W.2d 190, 196 (Tex. App. – Austin 1992, no
writ).  In addressing a factual sufficiency of the evidence challenge to  a
jury verdict, an appellate court must consider and weigh all of the evidence.  Dow
Chem. Co. v. Francis, 46 S.W.3d 237, 242 (Tex. 2001).  The verdict
should be set aside only if it is so contrary to the overwhelming weight of the
evidence as to be clearly wrong and unjust.  Id.; Cain v.
Bain, 709 S.W.2d 175, 176 (Tex. 1986).  However, this court is not a
fact finder, and we may not pass upon the credibility of the witnesses or
substitute our judgment for that of the trier of fact, even if a different
answer could be reached upon review of the evidence.  Durban v. Guajardo,
79 S.W.3d 198, 208 (Tex. App. – Dallas 2002, no pet.); Clancy v. Zale
Corp., 705 S.W.2d 820, 826 (Tex. App. – Dallas 1986, writ ref’d
n.r.e.).  

Applicability
of JOA to Reeder

            In
his first and sixth issues, Reeder contends that the JOA did not apply to him
as the operator because he was not a successor to the operator designated in
the 1996 agreement and therefore he did not owe any duties under the JOA.  He
does not challenge the validity of the JOA.  He concedes that he received a
copy of the JOA when he became operator in 1998 but argues that it applied only
to the original parties who signed the agreements in October 1996.  We
disagree.

            David
Fry testified that until 1996 he owned the entire working interest in both
units.  He stated that when he sold an interest to Secondary in 1996, he and Secondary
were required by the 1965 Sub-Clarksville unit agreement and the 1975 Harris
Sand unit agreement to execute a JOA.[3]  The
recorded unit agreements for both the Sub-Clarksville Unit and the Harris Sand
Unit included the following clauses:

 

1.9  Unit Operating Agreement,  shall mean an
Agreement (together with all amendments thereof) to be executed by and between
the Working Interest Owners covering the operations on the Unit Area for the
production of Unitized Substances from the Unitized Formation, which said
Agreement will be executed promptly after more than one Working Interest Owner
becomes a party to this Agreement.

 

4.1  Unit Operator.  Unit Operator shall have
the exclusive right to conduct Unit Operations.  The operations shall conform
to the provisions of this agreement and the Unit Operating Agreement, if
executed.  If there is any conflict between such agreements, this agreement
shall govern.

 

13.1  Agreement is a Covenant.  All of the
terms and provisions of this agreement shall extend to, be binding upon and
inure to the benefit of the respective heirs, devisees, legal representatives,
successors and assigns of the parties hereto, and shall constitute a covenant
running with the lands, leases and interests covered hereby.

 

 

            The
JOA specifically states that it is “binding upon and shall insure [sic] to the
benefit of the parties, their heirs, successors and assigns forever, continuing
in full force and so long as the subject leases remain intact.”  The mutual
agreement between Dekrfour and Secondary was incorporated into the JOA and also
states that it “shall be binding on and inure to the benefit of the parties to
this Agreement and their respective heirs, successors, and permitted assigns.” 
An operating agreement is typically in effect for as long as any of the oil and
gas leases subject to the JOA remain in effect.  See Ernest E. Smith & Jacqueline Lang Weaver, Texas Law of Oil and
Gas § 17.3(A)(1) (2009).  A successor operator is bound to the
terms of the operating agreement under which he is chosen, even though he is
not familiar with the provisions and would not have intended to accept some of
the provisions.  Id. at § 17.3(F)(1).

            Reeder
acknowledged receiving the JOA.  Reeder also acknowledged in writing to the
parties in this lawsuit, on three separate occasions, that he was the operator. 
In his suit filed in May 2004 against the Fry Interests, he described himself as
the “designated and official operator” of the Forest Hill Harris Sand Unit.  In
June 2005, Reeder sent a letter to the attorney for Wade and Scherbach stating
that he was the operator of the Forest Hill Harris Sand Unit.  In the
previously quoted August 2006 letter sent to Wade and Scherbach referencing the
Forest Hill Harris Sand Unit, he included a caption across the top  that
emphatically stated “WENDELL REEDER OPERATOR.”  Further, as we discuss
later in this opinion, Reeder attempted to avail himself of the exculpatory
clause in the JOA.

            Ratification
of a JOA occurs when the operator recognizes its validity by acting and
performing under its terms, as well as affirmatively acknowledging it.  See Stable
Energy, L.P. v. Newberry, 999 S.W.2d 538, 547 (Tex. App. – Austin 1999,
pet. denied).  The record before us is replete with instances of Reeder’s
exercising the managerial authority given to the operator under the terms of
the JOA.  

            Further,
the doctrine of quasi-estoppel precludes a party from accepting the
benefits of a transaction and then subsequently taking an inconsistent position
to avoid corresponding obligations or effects.  Fasken Land & Minerals,
Ltd. v. Occidental Permian, Ltd., 225 S.W.3d 577, 593 (Tex. App. – El
Paso 2005, no pet.);  Newberry, 999 S.W.2d at 548.  The doctrine
applies when it would be unconscionable to allow a person to maintain a
position inconsistent with one in which he acquiesced, or under which he
accepted a benefit.  Newberry, 999 S.W.2d at 548.  Here, Reeder
accepted the benefits and authorities of being the unit operator provided to him
under the JOA.  We hold that he ratified the JOA and is estopped from asserting
that he was not bound by it.  Thus, the evidence is legally and factually
sufficient to prove that Reeder is bound by the JOA.  We overrule Reeder’s first
and sixth issues.

Exculpatory
Clause in JOA

            In
several of his issues, Reeder attacks the jury’s affirmative answers to
Questions 8 and 18 that he breached his duty to the Fry Interests and Wood
County Oil.  Due to the language of the jury charge, we must determine the
effect of the exculpatory clause before we can address the sufficiency of the
evidence complaints presented.  The jury was given the same instructions for
both questions:

 

You are instructed that the joint operating agreement
requires the Operator to conduct operations in a good and workmanlike manner. 
A good and workmanlike manner requires the operator to act as “a reasonably
prudent operator.”

 

You are further instructed that the Operator is not
liable under this standard unless Operator’s conduct amounts to gross
negligence or willful misconduct.

 

You are further instructed that “gross negligence”
means that entire want of care which would raise the belief that the act or
omission complained or [sic] was a result of a conscious indifference to the
right or welfare of the person or persons to be affected by it.

 

Because the jury
was instructed that his conduct must rise to the level of gross negligence or
willful misconduct, Reeder argues that the findings cannot stand because the
evidence does not show that he committed gross negligence or willful misconduct. 
The “gross negligence or willful misconduct” language was apparently lifted
from what is known as the exculpatory clause in the JOA:

 

3.  [Operator] shall be the Operator of the Contract
Area, and shall conduct and direct and have full control of all operations on
the Contract Area as permitted and required by, and within the limits of this
agreement. . . . Operator shall conduct its activities under this agreement as
a reasonable prudent operator, in a good and workmanlike manner, with due
diligence and in accordance with good oilfield practice, but in no event shall
it have any liability as Operator to the other parties for losses sustained or
liabilities incurred except such as may result from gross negligence or willful
misconduct.

 

 

            We
have previously interpreted a similar exculpatory clause which reads, in
relevant part, as follows:

 

[Operator] . . . shall conduct and direct and have
full control of all operations on the Contract Area as permitted and required
by, and within the limits of, this agreement.  It shall conduct all such
operations in a good and workmanlike manner, but it shall have no liability as
Operator to the other parties for losses sustained or liabilities incurred,
except such as may result from gross negligence or willful misconduct.

 

 

Castle
Tex. Prod. Ltd. P’ship v. Long Trusts, 134 S.W.3d 267, 283 n.4 (Tex.
App. – Tyler 2003, pet. denied).  There, we held that this exculpatory clause
was limited to claims that the operator failed to act as a reasonably prudent
operator in its operations in the contract area and did not apply to a claim
that it otherwise breached the JOAs.  Id. at 283.  Although the
exculpatory clause under which Reeder operated includes the phrase “its
activities under this agreement as a reasonable prudent operator,” the
exculpatory clause is located within the paragraph describing “operations on
the contract area” as the exculpatory clause was in Long Trusts. 
See id.  We see no meaningful difference between the two
exculpatory clauses.  The complaints made against Reeder pertain to his alleged
breaches of the JOA.  Therefore, we hold that the JOA’s exculpatory clause does
not apply to the claims addressed by Questions 8 and 18.    

            During
the charge conference held before the court submitted the charge to the jury, the
Fry Interests and Wood County objected to the gross negligence and willful
misconduct instruction being submitted to the jury, contending this was a
breach of contract case.  The trial court overruled that objection.  As we have
discussed above, the standards of care provided in the exculpatory clause do
not apply to what this case was all about—a breach of contract.  Thus, the
gross negligence and willful misconduct instruction should not have been
included in the charge.

            To
preserve a complaint that an instruction in a charge is defective, the party
who does not rely on the instruction need only object.  First Valley Bank
of Los Frenos v. Martin, 144 S.W.3d 466, 475 (Tex. 2004) (Wainwright,
J., concurring).  An objection is sufficient to preserve error in a defective
instruction.  A request of substantially correct language is not required.  Id. 
Because the trial court submitted improper instructions that were properly
objected to, we measure the legal and factual sufficiency of the evidence supporting
the jury’s findings on Questions 8 and 18 against the elements of breach of
contract, not gross negligence and willful misconduct.  See St. Joseph
Hosp. v. Wolff, 94 S.W.3d 513, 530 (Tex. 2002).  Those elements are (1)
the existence of a valid contract; (2) performance or tendered performance by
the plaintiff; (3) breach of the contract by the defendant; and (4) damages
sustained by the plaintiff as a result of the breach.  Eckland
Consultants, Inc. v. Ryder, Stilwell Inc., 176 S.W.3d 80, 86 (Tex. App.
– Houston [1st Dist.] 2004, no pet.).   

Obligation
to Maintain Production of Units

            In
issues two through five, Reeder contends the evidence is legally and factually
insufficient to support the jury’s answer to Question 8 that he breached his
duty as operator by failing to maintain production in paying quantities or
other operations in the Forest Hill Field.  He argues that he owes no duty to
the Fry Interests to carry leases or maintain production because, although Dekrfour
and Nelson classified their interest as a carried working interest, their
interest bears none of the costs of production and “in reality they are owners
of an overriding royalty.”  He argues that an overriding royalty interest is
carved out of the working interest, is nonparticipating, and is wholly
dependent on the lessee to keep the lease alive.  Accordingly, he asserts that
he has no duty to keep the overriding royalty alive and where there is no duty,
there can be no breach.  He also argues that the failure to maintain production
in paying quantities or to maintain other operations in the Forest Hill Field
was due to the fact that Wade, Scherbeck, and Wood County Oil would not invest
more funds, rather than because of any breach on his part.  He asserts that the
only way for him to be responsible for allowing production to lapse is to find
that he had a duty under the JOA to consume his own resources to keep the lease
alive.  He argues that he had no such duty and that he could not afford to
contribute more of his personal funds.  Thus, he claims the evidence does not
support a finding that he failed to act as a reasonable prudent operator or
that he acted with gross negligence or willful misconduct.

Analysis

Reeder’s
contention that Dekrfour and Nelson owned an overriding royalty is contrary to
the language of the unit agreement and the JOA.  “Working interest” is defined
in the unit agreement as including a carried interest.  The unit agreement
specifically allows a carried working interest to be created by a JOA.  The mutual
agreement specifically created a carried working interest for Dekrfour in the
Harris Sand Unit.  

            An
oil and gas royalty is a share of the product or profit from real property,
reserved by the grantor of a mineral lease in exchange for the lessee’s right
to mine or drill on the land.  Black’s
Law Dictionary 1445 (9th ed. 2009).  “Royalty” is commonly defined as
the landowner’s share of production, free of expenses of production.  Heritage
Res., Inc. v. NationsBank, 939 S.W.2d 118, 121-22 (Tex. 1996). The oil
and gas working interest is the right to the mineral interest granted by an oil
and gas lease, so called because the lessee acquires the right to work on the
leased property, search, develop, and produce oil and gas, as well as the
obligation to pay all costs.  Black’s
Law Dictionary at 1745.  A “carried interest” in an oil and gas lease is
a fractional interest that is free of some or all costs of exploring, drilling,
and completing the well.  Id. at 885.  

            The
royalty interest is part of the lessor’s interest in an oil and gas lease.  A carried
working interest is part of the lessee’s interest in an oil and gas lease. 
Reeder has cited no authority for his proposition that the carried working
interest here must be treated the same as an overriding royalty interest. 
Because the terms of the unit agreement permit, and the mutual agreement specifically
created, a carried working interest as part of the working interest in the
Harris Sand Unit, Reeder cannot prevail on his argument that he owes no duty to
Dekrfour and Nelson because they are actually owners of an overriding royalty
interest. 

            The
mutual agreement that was incorporated into the JOA specifically states that
the operator “agrees to produce and/or conduct operations on the Harris Sand
Unit sufficient to maintain the leases and the unit.”  The evidence shows that
Reeder had no production from the Harris Sand Unit from September 2006 forward
and that production had begun declining precipitously in the preceding months. 
Reeder presented no evidence of any actions he undertook or other operations he
attempted that would maintain the leases and the unit.  David Fry testified
that the Fry Interests had been unable to achieve more production in the
Sub-Clarksville Unit because of Reeder’s refusal to allow them access to the
jointly owned wellbores as required by the JOA.  This is some evidence that
Reeder did not maintain production in paying quantities or take the necessary
actions required to maintain the leases and the unit.  By his inaction, Reeder
breached his duty under the explicit terms of the JOA to maintain production
and/or conduct operations sufficient to maintain the leases and the unit.  Thus,
Reeder’s challenge to the legal sufficiency of the evidence to support the
jury’s finding to Question No. 8 is without merit.  See Cazarez,
937 S.W.2d at 450.  

Reeder
testified that he maintained production in the Harris Sand Unit as long as he
could before he had to spend his money on other pressing business interests
that he owned, which caused him to give up on maintaining production in paying
quantities in the Harris Sand Unit.  Contractual obligations cannot be avoided
simply because the obligor’s performance has become more economically
burdensome than anticipated.  Huffines v. Swor Sand & Gravel Co.,
750 S.W.2d 38, 40 (Tex. App. – Fort Worth 1988, no writ).  The evidence shows
Reeder failed to maintain production in paying quantities, a breach of the JOA
by Reeder.  Having other pressing financial matters to attend to does not
excuse Reeder’s failure to comply with the terms of the JOA.  Further, Reeder
never attempted operations in the contract area that would have required Wade
or Scherbach to authorize expenditures under the JOA.  In fact, in a letter
dated June 9, 2006, he admitted to Wade and Scherbach that he did not have the
money to fund the 45% that would have been his share of the operations.[4] 
  Finally, as explained above, the gross negligence and willful misconduct
standards are not applicable here, and we need not address Reeder’s argument
regarding them.  The jury’s finding that Reeder breached his duty as operator
by failing to maintain production in paying quantities in the Forest Hill Field
is not so contrary to the overwhelming weight of the evidence as to be clearly
wrong and unjust.  See Dow Chem. Co., 46 S.W.2d at 242.  We
overrule Reeder’s issues two through five.

Obligation to Offer Well
No. 116 to Other Working Interests Before Abandonment

 

            In
issues seven through ten, Reeder contends the evidence is legally and factually
insufficient to support the jury’s answer to Question No. 18 that he breached a
duty to Dekrfour, Nelson, and Wood County Oil by failing to offer Well No. 116
to them prior to plugging the well.  Reeder argues that he did not elect to
abandon or plug the well, but was ordered by the Railroad Commission to plug
the well.  He also asserts that he owed no duty to Wood County Oil because Wood
County Oil did not have an interest in Well No. 116 at the time the Railroad
Commission ordered it to be plugged.  He also argues that, at the time the well
was plugged, Wood County Oil had ownership rights in the well and there is no
evidence that Reeder had any authority to offer the well back.  Finally, he
asserts the evidence is legally and factually insufficient to support a finding
that his actions amounted to gross negligence or willful misconduct. 

            In
1998, Reeder became the operator of Well No. 116.  From this time forward,
there was controversy between Fry and Reeder as to how Well No. 116 should be
produced.  In 2003, the well began to leak.  By its order dated October 21,
2003, the Railroad Commission ordered Reeder as the operator to plug the well. 
Reeder finally plugged the well on June 9 and 10, 2004.  

             Reeder
did not contest that he was the operator of Well No. 116.  Again, this
authority devolved upon him by the JOA, which stated in pertinent part:

 

                If Operator deems that a well should
be abandoned, it shall notify the non-Operators of such decision and offer his
interest in such well to any party willing to accept the well, together with
the plugging liability.  If no party requests such well, the Operator shall
cause the well to be properly plugged and the lease restored and the costs
there for shall be a joint expense under this Agreement.

 

            When
a well is plugged in Texas, it is considered abandoned.  See 16 Tex.
Admin. Code § 3.5(d)(2)(C) (2009) (Tex. R.R. Comm’n); see also Ridge
Oil Co. v. Guinn Invs. Inc., 148 S.W.3d 143, 147 (Tex. 2004). 
Therefore, by the terms of the JOA, Reeder was required to offer his interest
in Well No. 116 to the nonoperators before plugging the well.  The evidence
shows that on June 9, 2004, Dekrfour and Nelson, collectively, had a 12.5%
carried working interest in the Harris Sand Unit and that Wood County Oil had
an 87.5% working interest in the Harris Sand Unit.  They were nonoperators in
Well No. 116.  By the terms of the JOA, Reeder had the duty and authority to
offer Well No. 116 to the Fry Interests, Wood County Oil, or both before
plugging it, but he did not do so.  The evidence is legally sufficient to
support the jury’s answer to Question No. 18.  See Cazarez, 937
S.W.2d at 450.

            Reeder
contends the above provision of the JOA does not apply here because he did not
“deem” that the well should be abandoned, but instead was ordered to plug the
well.  We disagree.  The Railroad Commission initially recommended that he plug
the well.  At that point, he had the option of repairing the well.  When he
chose not to repair the well, he chose to abandon the well.  His argument that
he did not need to offer the well to Wood County Oil because it did not own an
interest at the time of the Railroad Commission’s order also fails.  The JOA
does not limit the offer requirement to a certain time period.  The wording
indicates that the offer of the well can be made at any time before the well is
plugged.  The assignment to Wood County Oil was signed on May 24, 2004 but was
effective November 24, 2003, one month after the Railroad Commission’s order to
plug the well and several months before Reeder actually plugged the well.  As
operator, Reeder had the authority and the duty under the JOA to offer the well
to nonoperators, including Wood County Oil.  Finally, as explained above, we
need not address Reeder’s argument that the evidence is legally and factually
insufficient to support a finding that his actions amounted to gross negligence
or willful misconduct.  The evidence is factually sufficient to support the
jury’s answer to Question No. 18.  See Dow Chem., Co., 46 S.W.3d
at 242.  We overrule Reeder’s issues seven through ten.  

Damages

            In
his eleventh issue, Reeder complains that Bob Ungerecht’s testimony of
valuation was conclusory and speculative and therefore no evidence.  In his
thirteenth issue, he attacks the jury’s allocation of damages between the Fry
Interests and Wood County Oil as being irreconcilably ambiguous.  In his
fourteenth issue, Reeder contends that the evidence is not legally and
factually sufficient to support the jury’s verdict on damages.   

            Before
a plaintiff can recover damages, he must prove “with reasonable certainty” the
damages he suffered from the defendant’s breach, including the value of “a
certain quantity of oil, worth a certain amount. . . .”  See Tex. Pac.
Coal & Oil Co. v. Barker, 117 Tex. 418, 427, 6 S.W.2d 1031, 1033
(1928).  The value of mineral reserves is not a matter of common knowledge, and
therefore it is the plaintiff’s burden to prove damages by expert testimony.  Arkoma
Basin Exploration Co. v. FMF Assoc. 1990-A, Ltd., 249
S.W.3d 380, 388 (Tex. 2008).  Experienced people who are acquainted with the
conditions of the land in the locality of the leased premises can give an
opinion as to the amount of recoverable oil in the unit.  See Barker,
117 Tex. at 427, 6 S.W.2d at 1034.  The plaintiff’s expert should, after
examining the logs and other relevant information from the field and
surrounding wells, give an opinion as to the probability of obtaining
production and the extent of such production on the land in question.  See County
Mgt., Inc. v. Butler, 650 S.W.2d 888, 890 (Tex. App. – Austin 1983, writ
dism’d).  Such matters as production costs, geological trends, proration, and
kind and quality of the oil should also be referred to by the expert in making
his opinion.  Id.  

The
nature of the inquiry makes it practically impossible to ascertain with
certainty the exact amount of the plaintiff’s damage.  Barker,
117 Tex. at 427, 6 S.W.2d at 1034.  But damages must be established with
reasonable certainty, not mathematical precision.  O & B Farms, Inc.
v. Black, 300 S.W.3d 418, 422 (Tex. App. – Houston [14th Dist.] 2009,
pet. filed).  If the best available evidence affords a reasonable basis for the
jury to calculate damages, then recovery cannot be denied because the exact
amount of damages cannot be ascertained.  Id.  As a general rule,
the jury has broad discretion to award damages within the range of evidence
presented at trial, so long as a rational basis exists for its calculation.  Khorshid,
Inc. v. Christian, 257 S.W.3d 748, 760 (Tex. App. –Dallas 2008, no
pet.).  The jury’s findings will not be disregarded merely because its
reasoning in arriving at its figures may be unclear.  Id.  

            Ungerecht,
who had been a petroleum engineer for fifty-two years at the time of trial,
testified that he used industry standards in preparing his testimony.  He
explained that he is familiar with the Harris Sand Field and had the
information necessary to do a complete and thorough evaluation of the field.  He
testified that, because of all the drilling and the production from both the
Sub-Clarksville Unit and the Harris Sand Unit, there was an abundance of
information available including logs, coring samples, maps, geological
formation information, production history, well tests, planimeter results, and
other documents to show him the amount of recoverable reserves for each of the twelve
tracts he testified about.  See Butler, 650 S.W.2d at 890.  He
further testified that he was able to study the production costs for operations
such as drilling, installing the surface equipment, and installing tanks.  He
also was able to determine the operating costs based on the documentation that
he had studied.  He discounted his evaluation for the decline rate, market
value, taxes, royalties, and the carried working interests.  He stated that he
considered the uncertainty and risk involved in beginning production again from
the unit formations.  He testified about the gravity of the oil in the Harris
Sand Unit compared to the lighter oil in the Sub-Clarksville Unit and how that
would affect the value of the recoverable oil.  See id.

Reeder
characterizes Ungerecht’s testimony as being speculative and conclusory. 
First, he states that Ungerecht based his valuation on records showing the
amount of oil in place in the two units in 1996.  He argues that the valuation
is thus founded on speculation that the basic reservoir information remained
unchanged for nearly twelve years.  Ungerecht specifically testified that while
the value of the reserves has changed over the years, the change was caused
primarily by the price of oil.  Therefore, while his earlier evaluations were the
basis of his calculations, he upgraded the information as to price.  The jury
was entitled to infer that Ungerecht, based on his years of experience,
considered whether the reservoir information had changed and determined that it
had not.  See City of Keller, 168 S.W.3d at 821.  Further, the
jury saw the production records from the intervening years showing very little
depletion in the field.  We disagree that Ungerecht’s reliance on the 1996
information makes the testimony speculative.    

            Reeder
challenges Ungerecht’s testimony because, while there was no production at the
time he testified, Ungerecht based the value of the reserves on the price of
oil at the time of trial, instead of the price at the time production ceased.  Ungerecht
explained that he had to extrapolate production based on the recoverable oil
because there were no current figures.  This was a logical explanation and one that
would help the jury in determining valuation.  

            Reeder
complains that Ungerecht valued the Harris Sand Unit reserves as though the
formation was in its primary recovery period when it was in a secondary
recovery period.  Ungerecht, on direct, testified that he based his valuations
on primary production.  However, during Reeder’s cross examination, Ungerecht was
asked hypothetical questions regarding secondary production on the Harris Sand
Unit.  Although Ungerecht answered these hypothetical questions, neither his
testimony nor any other evidence suggests that his valuation should not be
based on primary recovery.  Ungerecht’s testimony is not speculative or
conclusory.  Thus, the evidence is legally sufficient to support the damage
awards.

            Reeder
also attacks the jury’s allocation of damages between the Fry Interests and
Wood County Oil.  Generally, the jury awarded about one-tenth of Ungerecht’s
valuation to the Fry Interests for their losses in the Harris Sand formation
due to Reeder’s actions as operator.  This amount was three times the amount
awarded to Wood County Oil.  Reeder contends that this makes the jury’s answers
irreconcilable.  We disagree.  Ungerecht testified that the extraction costs
were very high for the oil produced out of the Harris Sand formation.  This
testimony was corroborated by both David Fry and Noble.  The jury could
therefore have rationally concluded that the carried working interests owned by
Dekrfour and Nelson were three times as valuable as the working interest of
Wood County Oil because of these heavy costs of production.  See Christian,
257 S.W.3d at 760.  

            Reeder
challenges the jury’s award of damages to the Fry Interests for their losses in
the Sub-Clarksville formation while awarding Wood County Oil zero damages for
that formation.  The plausible basis for this award is that the jury found the
production in paying quantities in the Sub-Clarksville Unit had ceased in
2003.  Wood County Oil did not acquire its working interest until 2004.  As a
result, the jury could rationally have determined that Wood County did not have
an interest in the Sub-Clarksville Unit when production in paying quantities
ceased.  See id.  

Based
on his experience and the documentation, Ungerecht assigned specific valuations
to each of the twelve tracts in the Sub-Clarksville and Harris Sand Units that he
was asked to value.  See Barker, 117 Tex. at 427, 6 S.W.2d at
1033.  The jury’s awards to the Fry Interests and Wood County Oil were much
smaller than Ungerecht’s valuations.  A jury’s verdict on damages cannot exceed
the amount shown by the evidence, but a jury need not award the full amount
testified to by the expert when the situation warrants a reduction. See Geo
Viking, Inc. v. Tex-Lee Operating Co., 817 S.W.2d 357, 363 (Tex. App. –
Texarkana 1991, writ denied).  Here, the nature of the asset being valued lends
itself to imprecise valuations.  The reports showed a wide range of production
levels for the field over the years.  Ungerecht testified that many variables
are not constant, including the price of oil and the costs of production and
maintenance.  Further, he testified that he considered “certain unknowns” such
as an estimate of the availability of each oil well to produce at a certain
rate and an estimate of the life of that well to produce.  Additionally, Ungerecht
testified that he was unable to determine productive capacity because the field
was not in full production.  Accordingly, the imprecision in the factors
Ungerecht relied on for determining valuation of the field warranted the jury’s
belief that the awards should be reduced.  Thus, the evidence is also factually
sufficient to support the damage awards. See Dow Chem. Co., 46
S.W.3d at 242.  We overrule Reeder’s issues eleven, thirteen, and fourteen. 

 

Wood County Oil’s Pleadings

            In
his twelfth issue, Reeder contends that Wood County Oil’s claim for damages is
not supported by its pleadings.  About a month before trial, Wood County switched
sides in the case.  Wood County had been aligned with Reeder against the Fry
Interests but filed a cross‑claim against Reeder alleging that he had
caused loss of the unit leases by his actions as unit operator.  About a week
before trial, Wood County filed its first amended petition continuing its
declaratory action on title issues but specifically nonsuiting all of its claims
against the Fry Interests.  The previously pleaded claim against Reeder is not
mentioned in the amended petition.

            Assuming
Wood County inadvertently nonsuited Reeder in the live pleading by omitting any
mention of its claim against Reeder, it is clear from a review of the record
that the breach of contract issues between Wood County Oil and Reeder were
tried by consent.  Both sides presented evidence against each other on these
issues and asserted differing positions on these issues at the charge conference. 
When both parties present evidence on an issue and the issue is developed
during trial without objection, any defects in the pleadings are cured at
trial, and the defects are waived.  See Tex. R. Civ. P. 67; Ingram v. Deere, 288
S.W.3d 886, 893 (Tex. 2009).  We hold that any defects in Wood County’s amended
pleading were cured when the breach of contract issues were tried by the
consent of the parties.  We overrule Reeder’s twelfth issue.

 

Conformity of Final Judgment to Jury’s Awards 

In
his fifteenth issue, Reeder complains that the trial court’s final judgment
does not conform to the actual awards the jury made to the Fry Interests.  We
agree.  The jury made the following specific monetary awards:

 

Dekrfour and Nelson                                          $299,102.50

Dekrfour, Nelson and
Bobby Noble                $390,887.00

Dekrfour                                                                $ 
  9,202.00

Nelson                                                                    $
 36,808.00

 

However, the
trial court’s judgment awarded damages as follows:

Dekrfour                                                                $138,719.10

Nelson                                                                    $561,237.00

Noble                                                                     $
 36,043.40

 

            The
trial court’s duty, and ours, is to ascertain the intention of the jury’s
answers and render a judgment in conformity with them.  See Tex. R. Civ. P. 301; In re Estate
of Bean, 206 S.W.3d 749, 760 (Tex. App. – Texarkana 2006, pet. denied). 
There is a clear discrepancy between the jury’s awards and the judgment.  We
sustain Reeder’s fifteenth issue.  

 

Attorney’s Fees 

            In
his sixteenth issue, Reeder contends that the trial court’s award of attorney’s
fees was not authorized and was not supported by legally and factually
sufficient evidence.  Based on the jury’s answers to Question No. 20, the trial
court awarded Marcus Carroll, the attorney for the Fry Interests, $125,000.00
in attorney’s fees with prejudgment interest at the rate of 6%.  Carroll
testified that his reasonable and necessary attorney’s fees for each of the
four claims asserted against Reeder totaled $115,250.00 as shown in the table
below.[5]  The table also
shows the amount of attorney’s fees the jury awarded for each of the four
claims, which totaled $125,000.00.

 

Cause of Action                           Carroll’s
Testimony                            Jury’s Award

Failure to file                                                                                

P-4 under JOA                              $
7,500.00                                             $ 7,500.00

 

Breach of JOA on 

failure to offer Well No.

116 before abandoning              $12,500.00                                           $35,000.00

 

Declaratory judgment

action to determine title             $55,250.00                                           $55,000.00

 

Breach of JOA for

loss of leases                                 $40,000.00                                           $27,500.00

 

                                                   
$115,250.00                                     $125,000.00

 

            Reeder
contends that attorney’s fees were not recoverable on the breach of the JOA
claims, that is, the failure to offer Well No. 116 to Dekrfour and Nelson before
plugging it and the loss of the leases.  He argues that the fees awarded were
not segregated by claim and contends further that because the fees were based
in part on claims for which such fees are not recoverable, the award cannot
stand.  

The
Texas Civil Practice and Remedies Code provides that parties may recover
reasonable attorney’s fees if the claim is for an oral or written contract.  Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8)
(Vernon 2008).  As we have shown in issue one, the JOA was a written contract,
and Reeder was bound by it.  The claim asserted by Dekrfour and Nelson (for the
failure to offer the well), and the claim asserted by the Fry Interests (for
the loss of the leases), arose under the JOA.  Further, attorney’s fees are
recoverable pursuant to the Declaratory Judgment Act.  See Tex. Civ. Prac. & Rem. Code Ann. § 37.009
(Vernon 2008).  Therefore, the Fry Interests can recover their reasonable and
necessary attorney’s fees for these claims, and the failure to segregate is not
error.  

            Reeder
also contends that there is insufficient evidence to support the award of
$125,000.00 in attorney’s fees.  We agree with this contention.  As the table
above shows, Carroll testified that $12,500.00 was a reasonable attorney’s fee
for his work on Dekrfour’s and Nelson’s claim that Reeder breached the JOA by
failing to offer Well No. 116 to them before plugging it.  Despite this
testimony, the jury awarded $35,000.00 in attorney’s fees for that claim.  The
evidence is not factually sufficient to support this portion of the jury’s attorney’s
fee award.  It is an abuse of discretion for the trial court to award fees
without factually sufficient supporting evidence.  Bocquet v. Herring,
972 S.W.2d 19, 21 (Tex. 1998).  

Carroll
testified that his attorney’s fees totaled $115,250.00.  The jury determined
that $27,500.00 was a reasonable fee for Carroll’s work on the breach of the
JOA by the loss of the leases, $12,500.00 less than Carroll testified to.  The
jury also awarded $250.00 less than Carroll testified to earning on the
declaratory judgment action.  The jury was entitled to award a lesser amount if
it so chose.  See Geo Viking, Inc., 817 S.W.2d at 363.  Therefore,
based on Carroll’s testimony and the jury’s award, the trial court should have
awarded Carroll $102,500.00 in reasonable attorney’s fees.  The evidence is
legally and factually sufficient to support an award in this amount.  We
sustain Reeder’s sixteenth issue in part and overrule it in part.

Prejudgment Interest

            In
his seventeenth issue, Reeder contends that the trial court miscalculated the
prejudgment interest on awards to Dekrfour, Nelson, Noble, and Wood County Oil. 
He argues that the trial court erroneously used March 14, 2006, the date the
Fry Interests filed their counterclaim, as the starting date for calculating
all prejudgment interest.  He asserts that prejudgment interest on damages
awarded to the Fry Interests under Questions 9 and 10 should be calculated from
the date of their amended counterclaim, July 20, 2007, which is the date the claim
addressed in those questions was first pleaded.  He further asserts that
prejudgment interest for Wood County Oil should be calculated from January 10,
2008, when it filed its original cross-claim against Reeder.  We agree that
prejudgment interest on the damage awards was miscalculated.  See Tex. Fin. Code Ann. § 304.104 (Vernon
2006).  Further, the prejudgment interest awards are based on the erroneous
damage awards and must be recalculated due to our disposition of issue fifteen. 


            Reeder
also contends the trial court erred by awarding prejudgment interest on the award
of attorney’s fees.  Prejudgment interest is generally not allowed on an award
of attorney’s fees.  See C & H Nationwide, Inc. v. Thompson, 903
S.W.2d 315, 325 (Tex. 1994).  We sustain Reeder’s seventeenth issue.

Conclusion

            Reeder,
as operator, is bound by the 1996 joint operating agreement, and the claims
asserted against him here are for breach of contract. When measured against the
elements of breach of contract, the evidence is legally and factually
sufficient to support the jury’s findings that Reeder breached his duty as
operator by failing to maintain production in paying quantities or other
operations in the Forest Hill Field and by failing to offer Well No. 116 to the
nonoperators before plugging the well.  The evidence is also legally and
factually sufficient to support the jury’s damage awards.  However, the trial
court’s judgment does not conform to the jury’s damage awards.  Because we have
the necessary information before us, we may reform the judgment.  See Tex. R. App. P. 43.2(b); Mullins
v. Mullins, 202 S.W.3d 869, 878 (Tex. App.–Dallas 2006, pet. denied). 
Accordingly, we modify the judgment to order the specific damage awards as
found by the jury.  Because the prejudgment interest on the damage awards was
miscalculated, we modify the judgment to reflect the proper amounts of
prejudgment interest.  Because it is not appropriate in this case, we delete
the award of prejudgment interest on attorney’s fees.      

We
affirm the trial court’s judgment with respect to attorney’s fees in the amount
of $102,500.00, conditioned on a remittitur of attorney’s fees in the amount of
$22,500.00.  See Tex. R. App. P. 46.3;
Stukes v. Bachmeyer, 249 S.W.3d 461, 470 (Tex. App.–Eastland
2007, no pet.).  If this remittitur is not filed within fifteen days from the
date of this opinion, the trial court’s judgment as to attorney’s fees will be
reversed and the cause will be remanded to the district court for a new trial.  See
Tex. R. App. P. 46.3.  

We
affirm the trial court’s judgment, as modified.  

                                                                                                    
JAMES T. WORTHEN    

                                                                                                                
Chief Justice

Opinion delivered July 14, 2010.

Panel consisted of Worthen,
C.J., Griffith, J., and Hoyle, J.

 

(PUBLISH)









[1] The existing wellbores could be
used to produce from either unit, but only from one unit at a time.





[2]
 Noble was aligned
with Dekrfour and Nelson throughout the trial, and we will include him with
them when we refer to the Fry Interests in this opinion. 





[3]
 Documents in the
record show that Dekrfour owned the working interest transferred to Secondary. 
Fry owned Dekrfour and signed various documents as president of Dekrfour.





[4]  Nothing in this opinion should
be construed as requiring an operator to conduct an operation when the
nonoperating leasehold working interest owners elect not to participate in,
i.e., pay for, that operation.





[5] Reeder has not challenged, and
therefore we do not address, the jury’s award to Patricia Fry for Reeder’s
failure to file a P-4 with the Texas Railroad Commission or the court’s
declaratory judgment to determine title.